THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PEDRO RODRIQUEZ *et al.*, Defendants-Appellants.

First District (5th Division)    Nos. 79-2001, 79-2002 cons.

Opinion filed September 11, 1981.

James J. Doherty, Public Defender, of Chicago (Robert Guch, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Barry A. Gross, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a bench trial, defendants were convicted of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and sentenced to prison terms of 20 to 35 years. On appeal they argue that they were not proved guilty beyond a reasonable doubt because (1) the prosecution witnesses contradicted themselves and each other; (2) defendant Luis stabbed the victim in self-defense; and (3) even if the stabbing was not justified, Luis' acts constitute no more than voluntary manslaughter. Defendants further argue that the court imposed excessive penalties because of defendants' failure to admit guilt; consequently, they must be resentenced. We affirm.

The record before us contains the evidence adduced at defendants' two trials. The first, a jury trial, ended in March of 1979 when the jurors were unable to reach a verdict and the court declared a mistrial. In the fall of 1979, defendants were tried before the bench and found guilty. To avoid the confusion of reciting each witness' testimony from both trials, we will focus on the primary discrepancies in the witnesses' versions of the incident as they become relevant to the reasonable doubt issue. The

following fact summary, therefore, is an overview which does not attempt to catalog every conflict in the evidence.

On October 16, 1977, Antonio Vasquez-Rodriquez (Tony), an off-duty bartender, was fatally stabbed in a Chicago tavern. The prosecution's eyewitnesses were Inez Graciani, the bartender on duty that night, and Luis Rodriquez (Indigo), a friend of Tony's who occasionally helped tend bar. According to Inez and Indigo, the incident began when defendant Luis intervened in Tony's attempt to prevent a man named Pachuco from pushing other patrons in the bar. There was a scuffle, during which Luis told his brother, Pedro, to stab Tony. Luis stood behind Tony, holding him while Pedro stabbed him in the chest. Indigo testified that Luis also stabbed Tony in the back.

Juan Luquis, the tavern owner, noticed the disturbance when he came out of the bathroom. He picked up the telephone but Luis, holding a knife, told him not to call the police or "the same thing" would happen to him. Luquis testified that he then watched Pedro kick Tony, who was lying on the floor, in the face, saying, "Johnny, you have a dirty bartender working here." Pedro and Luis left the tavern shortly thereafter and Luquis ran after them, firing his gun.

When police arrived, Tony was dead. They found a white-handled knife on the floor. The police interviewed all of the tavern patrons concerning the incident.

Two days later, police officers knocked on the door of defendants' apartment. Defendants jumped out of a window to escape, but the police captured and arrested them.

At the trial, the pathologist testified that Tony had died from stab wounds. He identified three stab wounds in Tony's chest, one in the left leg and another in Tony's back. There were other minor wounds on Tony's chin and finger.

Juan Luquis, the tavern owner, testified that two weeks before the incident, defendant Pedro was arguing with another patron in the bar when Tony, who was tending bar, intervened. Pedro was ejected from the bar and allegedly threatened Tony, "Don't worry, I'll get you."

After the prosecution rested, defendants related their version of the stabbing. Pedro, who testified that he was not involved in the fight, said he saw his brother and Tony on the floor and noticed that Luis was bleeding from the neck. A few seconds later, Pedro and Luis fled the tavern when Luquis ran to them with a gun. Pedro testified that when he and Luis jumped from the window of their apartment when the police arrived, they had thought their pursuers were people from the tavern. Pedro further denied that Tony had been involved in the incident that took place two weeks prior to the stabbing, when Pedro had argued with a customer.

Luis testified that he and Pedro were in the tavern when Pachuco entered and started pushing people. Tony came from behind the bar and started hitting Pachuco. Luis then stepped in to ask Tony to stop the beating. He testified that Tony, who appeared drunk, pulled a knife on him and stabbed him in the neck. Luis then grabbed Tony's knife hand, twisting it behind Tony's back. In so doing, Luis cut his hand. He believed that twisting Tony's arm probably caused Tony to stab himself in the back before dropping the knife. Luis grabbed Tony to prevent him from retrieving the knife and Tony began hitting him in the face. The two men fell on the floor. Tony sat astride Luis and put his hands around Luis' neck. Luis then grabbed the knife and stabbed Tony in the chest, fearing for his life. Luis corroborated Pedro's account of their arrest following their attempt to escape through the window of their apartment. He explained that the police did not announce their office and that he and Pedro feared that Tony's relatives were pursuing them.

Dr. Michael Schaeffer testified for the defense. On the basis of certain tests, he believed that Tony was under the influence of alcohol at the time of death.

Following closing arguments, the court found both defendants guilty as charged.

OPINION

Defendants contend that the prosecution failed to prove them guilty beyond a reasonable doubt, primarily because of contradictions in the witnesses' testimony. Under the applicable law, conflicts in the evidence are to be resolved by the fact-finder, and the reviewing court will not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of a defendant's guilt. (E.g., People v. Yarbrough (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) The conviction may be based solely on the credible testimony of a single witness. (People v. Yarbrough; People v. Mays (1979), 74 Ill. App. 3d 145, 392 N.E.2d 106.) In the pending case, the determinative question is whether the omissions and contradictions in the witnesses' testimony destroy their credibility.

Defendants theorize that the three main prosecution witnesses, Inez, Indigo, and Luquis, all friends of Tony, altered or fabricated their accounts of the stabbing to place sole blame for Tony's death on defendants. To support this thesis, they argue that the two eyewitnesses, Inez and Indigo, failed to tell investigating officers at the time of the occurrence that they had witnessed the stabbing. Instead, they jointly planned a version of the occurrence that would "frame" defendants of their friend's murder. As a result, defendants imply, the witnesses were unable to give clear, consistent testimony as to the stabbing. As further support for this theory, defendants point to the prosecution witnesses'

testimony that Tony had drunk only 1-2 beers on the night of the incident and was not intoxicated. The toxicologist, in direct contrast, gave his opinion that Tony had drunk approximately 9-12 drinks and had been under the influence of alcohol. For the above reason, defendants urge us to hold that the prosecution's witnesses totally lacked credibility.

While we acknowledge that there were discrepancies in the prosecution witnesses' testimony, we do not believe they are significant enough to raise a reasonable doubt of defendants' guilt. Many of the contradictions involve minor points or collateral issues, such as whether Tony was standing behind the bar or in front of it when Pachuco entered the tavern and started pushing people. Similarly, Inez' and Indigo's possibly mistaken testimony that Tony was not drunk does not mean that their accounts of the stabbing are unbelievable. Inez testified she served Tony only two drinks, but she would not necessarily be aware of other liquor he may have consumed before her arrival, or while she was tending to other customers. Moreover, Tony's intoxication is not a material issue in the case, except as it might have affected his behavior that night. The ultimate factual question before the court, rather, was *defendants'* mental state or intent as they killed Tony. Murder, self-defense, and voluntary manslaughter require different states of mind, as defined by statute. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1 (murder), par. 9—2 (voluntary manslaughter), par. 7—1 (self-defense).) The key evidence bearing on defendants' mental states is the eyewitness testimony that Pedro stabbed Tony in the chest while Luis restrained him from behind. The court also noted that the physical evidence regarding the stab wounds was consistent with this version of the incident.

Admittedly, the record reveals some confusion as to the exact sequence of events. For example, Inez testified at the first trial that just before the stabbing, a customer called her over. When she turned back to Tony and Luis she saw Pedro pick up a white-handled knife and stab Tony. At the second trial, however, she testified that she responded to the customer's call just *after* witnessing the stabbing. Indigo testified at the first trial that he saw both defendants approach Tony, while at the second trial he said that Luis approached defendant alone and Pedro came over later.

■■ We disagree with defendants that these and similar conflicts in the witnesses' testimony raise a reasonable doubt of defendants' guilt. It is unrealistic to expect witnesses to a sudden, violent stabbing to describe it with "stop action" accuracy. The exact positions of the parties and the precise sequence of their actions would be difficult for anyone to recreate perfectly. Hence, we find the internal inconsistencies in Inez' and Indigo's testimony to be minor in view of their positive statements that they witnessed defendants restrain and stab the victim.

Defendants further argue, however, that not only did the witnesses contradict themselves, but they also contradicted each other. Inez testified she saw only Pedro stab Tony while Luis restrained him; Indigo testified he saw both Pedro and Luis stab Tony. Also, Inez saw Pedro bend over to pick up a knife; Indigo did not observe this.

Again, we find these inconsistencies to be insubstantial and explainable. Both witnesses viewed the occurrence from different positions and one could easily have observed or recalled details that the other did not. Indeed, Indigo testified he did not watch closely until he heard Luis say, "Stab him." Thus, it was not until that point that his attention was aroused, whereas Inez might have been watching the two men a few seconds earlier. The differences between their accounts of the events, therefore, do not discredit either or both witnesses. In fact, the likelihood of their collaboration on a made-up version of the events would probably be stronger had their testimonies been identical in every detail.

Citing *People v. King* (1973), 10 Ill. App. 3d 652, 295 N.E.2d 258, defendants next contend that the witnesses' credibility was severely impeached because they failed to immediately inform police that they had observed the stabbing. In *King* the complaining witness accused defendant of rape several months after the incident occurred. When she finally contacted the police, she failed to tell them that she had seen her assailant, at the lounge where she worked, several times before and after the incident. In describing her assailant, moreover, she did not mention that he had a heavy mustache. The appellate court reversed defendant's conviction, holding that the complaining witness' testimony was too doubtful under the circumstances and that her trial testimony was discredited by her failure to inform the police of seeing her assailant several times before and after the incident.

In contrast to the facts of *King*, the pending case does not involve a serious question of defendants' identity as the victim's assailants.[1] Nor does it involve a lengthy delay between the time of the incident and the witnesses' cooperation with police. Both Inez and Indigo spoke to investigators and had identified defendants within two days of the stabbing. Inez, who speaks and understands only Spanish, talked to the police on the night of the slaying through an interpreter. Thus the resulting police report was the officer's summary of what a third party related on behalf of Inez. The trial court, in considering her failure to tell the officers that she witnessed the stabbing, noted that witnesses may be

---

[1] The transcript reveals that Indigo and Inez were unsure of defendants' names and referred to them as "the big one" and "the little one." Indigo had transposed their names at the preliminary hearing, but both he and Inez accurately identified the defendants in court. Confusion over the names, therefore, does not discredit the witnesses' identification of defendants.

initially reluctant to become involved in a criminal investigation. The court went on to find Inez' trial testimony believable, because it was related under oath, subject to cross-examination, and was corroborated by other evidence. Similarly, although Indigo failed to immediately inform police that he saw the stabbing, he identified defendants from photographs and in a lineup within two days after the incident. We believe, therefore, that the trial court properly considered the witnesses' behavior on the night of the stabbing in its evaluation of their testimonies, along with all the other circumstances.

■■ Defendant Luis next contends that his actions constituted self-defense or, at most, voluntary manslaughter. Both theories rest on Luis' version of the stabbing, that Tony was the knife-wielding aggressor. Luis focuses on the evidence that his neck was cut during the incident, apparently believing that this is persuasive evidence supporting his defense. We disagree. In a struggle involving a knife it is not unlikely that the aggressor would be wounded as well as the victim. The trial court considered all of the evidence, as well as a determination or reenactment of the stabbing and concluded that Luis had not acted in self-defense. Of course, had the trial court believed defendant Luis' testimony, it could have found his actions to be justified by a reasonable fear for his life. Alternatively, the court could have found his belief unreasonable or that he acted under provocation in the heat of the battle and found him guilty of voluntary manslaughter under subsection (a) or (b) of section 9—2 (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(a), (b)). For us to reverse defendants' convictions or reduce them to voluntary manslaughter, however, we would have to ignore the trial court's factual findings, based on two eyewitnesses' testimonies, that Luis restrained Tony while Pedro stabbed him. We have carefully considered the record and all arguments and conclude that defendants were proved guilty of murder beyond a reasonable doubt.

Defendants finally argue that their sentences were based on an improper factor and must be vacated so the case can be remanded for resentencing. They contend that the trial judge erroneously emphasized their failure to admit guilt when he stated that "[o]ne of the first steps toward rehabilitation is remorse. * * * The court has observed no remorse."

We disagree that the court erred. In *People v. Carter* (1980), 85 Ill. App. 3d 818, 407 N.E.2d 584, we reaffirmed the principle that a court, in imposing a sentence, may properly consider a defendant's failure to show a "penitent spirit." *Cf. People v. Sherman* (1977), 52 Ill. App. 3d 857, 368 N.E.2d 205; *People v. Moffett* (1977), 55 Ill. App. 3d 939, 371 N.E.2d 364.

■■ In the pending case, the trial court heard arguments in mitigation and aggravation, and concluded, after considering "the nature of the charge, the background of the defendants and the evidence," that sentences of

20-35 years imprisonment were proper. This was not an abuse of discretion; therefore, we cannot alter the sentence. See *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

For the foregoing reasons we affirm the trial court's judgment.

Affirmed.

LORENZ and MEJDA, JJ., concur.